NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10503

COMMONWEALTH  vs.  LUIS PENN.


Essex.     May 8, 2015. - September 9, 2015.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.


Homicide.  Firearms.  Constitutional Law, Public trial.
    Identification.  Practice, Criminal, Capital case, Public
    trial, Assistance of counsel, Instructions to jury,
    Argument by prosecutor, Sentence.



    Indictments found and returned in the Superior Court
Department on May 5, 2004.

    The cases were tried before Howard J. Whitehead, J., and a
motion for a new trial, filed on October 29, 2010, was heard by
him.


    Dana Alan Curhan for the defendant.
    Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


    GANTS, C.J.  A Superior Court jury convicted the defendant

of murder in the first degree on a theory of deliberate

premeditation for the killing of the victim, Aneury Guzman.[1]  The critical issue in the case was whether the victim had been shot by the defendant or by the defendant's friend, Benjamin Serrano, who minutes before the shooting had confronted the victim with a firearm, handed the firearm to the defendant, and then engaged in a fist fight with the victim.

On appeal, the defendant claims that he is entitled to reversal of the murder conviction because the evidence was insufficient as a matter of law.[2]  Alternatively, he claims that, even if the evidence were legally sufficient, the court should exercise its authority under G. L. c. 278, § 33E, to vacate the conviction, order a new trial, or reduce the conviction to murder in the second degree because the verdict was contrary to the weight of the evidence and not consonant with justice.  In addition, he claims that the murder conviction should be vacated or a new trial ordered because his right to a public trial was violated by the unconstitutional closure of the court room during jury selection; because the jury were not instructed about the risk of honest, but mistaken, eyewitness identification; and because the prosecutor vouched for the accuracy of the key eyewitness and expressed her personal belief

---

[1] The defendant was also convicted of carrying a firearm without a license in violation of G. L. c. 269, § 10 (a).

[2] The defendant does not challenge his conviction on the firearm indictment on appeal.

in the defendant's guilt during closing argument.  Finally, the defendant claims that, even if his murder conviction were to be affirmed, he is entitled to a reduction in sentence to life with the possibility of parole where he was seventeen years old at the time of the killing.  We affirm the defendant's conviction of murder in the first degree, but order the case remanded for resentencing in accordance with Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671-674 (2013), S.C., 471 Mass. 12 (2015).

Background.  Because the defendant challenges the sufficiency of the evidence, we recite the evidence in the Commonwealth's case-in-chief in detail and in the light most favorable to the Commonwealth.  See Commonwealth v. Labadie, 467 Mass. 81, 93-94, cert. denied, 135 S. Ct. 257 (2014).[3]  Because the defendant additionally claims that the verdict is contrary to the weight of the evidence, we also summarize the other relevant evidence, including the defendant's trial testimony. See Commonwealth v. Franklin, 465 Mass. 895, 896 (2013).

_____

[3] In evaluating the sufficiency of the evidence, we must also consider, in the light most favorable to the Commonwealth, "the evidence at the close of all the evidence to determine whether the Commonwealth's position as to proof had deteriorated since it had closed its case." Commonwealth v. Brown, 51 Mass. App. Ct. 702, 709 (2001), quoting Commonwealth v. Basch, 386 Mass. 620, 622 n.2 (1982).  Here, however, the only evidence following the close of the Commonwealth's case was the defendant's testimony, which, viewed in the light most favorable to the Commonwealth, the jury were entitled not to credit.

1.  Commonwealth's case-in-chief.  Serrano had dated Jennifer Suarez "on and off" for approximately four years when she ended her relationship with Serrano and began dating the victim in January, 2004.  Serrano told Suarez that "he didn't want [her] with [the victim]," and that she was "his girl and [was] always going to be with him."  Serrano also threatened the victim, telling Suarez that "he's going to kill" the victim, and "[w]atch when he catches him."

On the evening of April 1, 2004, Serrano knocked on the apartment door of Suarez's cousin, Vicky Gonzalez, who resided in a three-story multifamily building in Lawrence near the corner of Haverhill Street and Oxford Street.  Gonzalez "cracked" open the door and saw Serrano, whom she knew, dressed in a "brown down coat."  Serrano's jacket had a hood, but he did not "have it on."  Just behind Serrano was a man she did not know, who was dressed "all in black":  "[b]lack sneakers, black pants, [and a] black jacket."  The man had his "hood" on, and his face was "totally covered" with "what must have been a mask or something."  Serrano asked for Suarez, and pushed the door, trying to look into the apartment.  Gonzalez told him to leave, and Serrano said, "I want Jennifer and I know she's here."  Gonzalez told him that she would call the police if he did not leave, and he and the other man left.

Unknown to Serrano, the victim was in the apartment when Serrano tried to enter. Minutes earlier, the victim had come to the apartment in an automobile with his friends, Johan Abreu and Santo Suarez,[4] and they were waiting for the victim in the automobile in a parking lot off of Oxford Street outside the entrance to Gonzales's apartment. When Serrano walked outside, he banged on the hood of the automobile.[5] After Abreu asked Serrano what he was doing there, Serrano pulled out a gun from his waistband and told them "it's not with you" and "to get . . . out of here." As this was happening, the victim came out of the apartment building and stepped between Serrano and his friends, facing Serrano. Serrano pointed the gun at the victim's face and said, "Look where I found him," "this is the way I want[ed] to catch you." He asked, "Who's a bigger man with a gun?" Abreu screamed at Serrano to put down the gun and fight with his hands. The victim told Serrano, "Do what you got to do." Serrano struck the victim with his free hand and called for "Fifty" to come out, at which point the defendant came out from an alley alongside the apartment building.[6] Serrano said he

---

[4] Santo Suarez is Jennifer Suarez's brother. Because they share a last name, we shall refer to him by his first name.

[5] Johan Abreu testified that Serrano was wearing "a jacket with a hoodie," and that the hoodie was "up" rather than "down."

[6] The defendant, who was known as "Fifty," was wearing a jacket and had "a hoodie on" when he emerged from the alley.

wanted to fight the victim, and handed the defendant his gun. Serrano and the victim started "scuffling," and then "wrestling, trying to throw each other down to the ground."[7] The defendant, who was pointing the gun at the victim, said, "Fuck these dudes," and Santo ran. Abreu saw the victim "trying to cut loose," and Abreu ran, thinking the victim was going to run behind him. Abreu ran "faster than a cat" up Haverhill Street, and then down an alley back towards the entrance to Gonzalez's apartment. As he was running down the alley, he heard a gunshot. He then ran back to the corner of Haverhill Street and Oxford Street, where he found the victim "[l]aying down" on the sidewalk. He did not see who had fired the gunshot.

The medical examiner concluded that the victim died from a single bullet wound at the top and towards the rear of the victim's head. From the nature of the wound, he offered the opinion that the barrel of the gun was against the victim's scalp, and that the path of the bullet was "downward."

The only witness to the shooting was Jose Estrella, who was at a gasoline station on Haverhill Street on the opposite side of the street from where the shooting occurred, pumping gasoline

---

Abreu identified the defendant from a photographic array as the person Serrano called "Fifty" who was holding the gun during the fight, and also identified him at trial.

[7] Abreu testified that Serrano's hoodie "came down" as they were "scuffling."

into his car on the street side of the pump.  From that vantage point, he saw a man, later identified as the victim, run north on Oxford Street and turn left on Haverhill Street.  The victim suddenly stopped on Haverhill Street and turned around to face in the direction of the corner with Oxford Street.  He saw a second man running right behind the victim, who stopped "right on the corner" after the victim stopped, and who then began to walk towards the victim.  The victim raised both hands above his waist and said something to the second man, who said something back.  The second man continued to approach, getting so close to the victim that he was "breathing on [his] face."  The second man then lifted his right hand upwards over his head, "swinging" it around and pointing it downward towards the head of the victim.  Estrella heard a gunshot, and the victim immediately fell to the ground.  The second man walked back in the direction from which he had come, and then began to run.

Estrella noted that it was dark and drizzling when he saw the shooting.  From his vantage point, Estrella was between 178 and 230 feet from the location of the shooting.  Estrella saw that the shooter was wearing a black or dark-colored winter coat, with a hood over his head.  Estrella testified that the second man was taller than the victim, and that he could see

when they came close together that the second man's chin nearly touched the center of the victim's forehead.[8]

The victim was five feet, six inches tall; Serrano is five feet, five inches tall; the defendant is five feet, eleven inches tall.

During the examination of the crime scene, next to a bloodstain on the sidewalk the police found a Virgin Mary medallion that belonged to Serrano, a single .22 caliber shell casing, and a closed pocket knife. Nearby, they found a Jesus medallion that belonged to the victim, and a jacket that belonged to the victim.[9,10]

The first 911 call reporting the shooting was made at approximately 9:00 P.M. Approximately twenty minutes later,

---

[8] Jose Estrella testified that the victim was standing "straight up" during the encounter, and denied that he was "crouched down."

[9] The Jesus medallion was found on the street at the corner of Haverhill Street and Oxford Street. The victim's jacket was found partially on the sidewalk and in the street. The other items were found on the sidewalk. Neither of the medallions was found with a chain.

[10] Deoxyribonucleic acid (DNA) testing revealed that the blood on the knife came from two persons, with the DNA of the victim matching the "major DNA profile." The DNA from the handle of the knife was a mixture of at least three individuals' DNA, with the DNA of the victim again matching the "major DNA profile." The defendant was excluded as the source of both the blood and the "handler DNA." Serrano was excluded as a source of the blood on the knife, and it was inconclusive whether he was a source of the "handler DNA," that is, he could be neither included nor excluded as a source.

Officer Jamie Adames conducted an investigative stop of Serrano in the Essex Street projects, which is approximately "three intersections" from the location of the shooting.  Serrano was wearing a black "bubble" jacket.  The jacket had a hood, but Serrano was not wearing the hood, even though it was "pouring" rain.  Officer Adames conducted a patfrisk of Serrano, but found no weapons.

On the evening of April 3, after speaking by telephone with the defendant, Stephanie Bertone traveled by taxicab to a motel in Middleton, where the defendant was now staying.[11,12]  The defendant told her that "there were people after him."  They stayed for "a couple of days" at the motel, and then traveled to Shamokin, Pennsylvania, where they stayed with a friend of the defendant's mother.  While in Pennsylvania, Bertone asked the defendant why they had left and why they were there.  The defendant told her that he was driving around with "Benji" in Benji's motor vehicle when Benji saw "some kid that he had a problem with and they stopped the car."  Benji got out of the vehicle and "started arguing with the kid and he ended fighting

---

[11] Stephanie Bertone testified that, at this time, the defendant was an "ex-boyfriend."

[12] The defendant had resided with his mother at an apartment in Lawrence.  When the police gained entrance to the apartment on April 6, 2004, there was no furniture or clothing in the apartment, but only some "old mail."  State police Trooper Brandon Arakelian testified, "The place was cleaned out."

with him."  When the kid had Benji down on the ground, Benji told the defendant to get out of the vehicle and bring him the gun that Benji had in it.  The defendant walked over to "where Benji and the other kid were fighting," and the defendant "went to hand" Benji the gun.  The defendant then paused, and Bertone asked him what happened.  He responded, "You can guess what happened."

The defendant was arrested in Shamokin on April 14, and State police Trooper Brandon Arakelian interviewed him in the library of the county jail on April 15, in the presence of Lawrence police Detective Victor Morales and Officer William Miner of the Shamokin police department.  After the defendant was advised of his Miranda rights and waived them, the defendant provided a signed written statement in which he said that on the evening of April 1, he was home from 6 P.M. to after midnight with his friend, "David Domingoes," and his girl friend, "Melanie."  Domingoes left to go home but returned at around 1 A.M.  The defendant left with Domingoes in Domingoes's mother's automobile and were traveling on Basswood Street, near the corner of Juniper Street, when someone in another vehicle with four people inside "shot at" the automobile in which the defendant was traveling.  Two persons stepped out of that vehicle, walked over to Domingoes's automobile, and fired "a couple of shots" at the driver's side of it, putting holes in

the windows.  The defendant stayed at his home that night but the next day went to the home of his mother's friend "because [he] got shot at."  After one night there, he went to stay at the motel.  He called Bertone and "told her that [they] needed to bounce."  He did not learn that the victim had been killed until after he arrived in Pennsylvania.  The defendant also said in his statement that he knew "Benji from the area" and knew that Benji "had problems" with the "kid who got shot . . . over a girl."

The defendant gave a cellular telephone number for Domingoes, but Trooper Arakelian was unable to reach Domingoes at the number and was never able to locate him.  Trooper Arakelian also asked the defendant for Melanie's last name and street address, but the defendant provided neither.  The trooper also determined that there were no reports of shots fired in the area of Basswood and Juniper Streets on the night of April 1, or the day that preceded and the day that followed that night.  In fact, the only report of gunfire in that timeframe in Lawrence was the report of the shot that killed the victim.

After this police interview, the defendant asked to speak with Officer Miner alone.  The officer explained to the defendant that the best thing the defendant could do was tell the other officers the truth.  The defendant "took a breath" and told Officer Miner, "I was there; I had the gun."  The defendant

then paused and added, "Things just got crazy."  After another pause, he said, "I just don't know what to do."

2.  Defendant's trial testimony.  The defendant testified in his own defense.[13]  He said that he had known Serrano for about one and one-half months before the shooting.  On April 1, at approximately 8 P.M., he was at a barber shop and saw Serrano, who told him he was going to see his girl friend.  He stood behind Serrano, on the stairs, when Serrano knocked on an apartment door and learned that "Jennifer" was not home.  The defendant told Serrano he was going to go home.  Serrano passed him on the stairs and approached an automobile that was parked outside.  Two men got out of the vehicle, and Serrano asked, "Where is he?"  One of the men said he did not know.  A "kid" then came down the same set of stairs that Serrano and the defendant had just descended.  Serrano saw the kid, pulled out a gun and said, "This is the way I wanted to catch you."  Until that moment, the defendant had not seen the gun and did not know that Serrano was carrying a gun.

Serrano pointed the gun at the top of the kid's head, with the wrist aimed downward, and asked, "Who's the man now?"  After the kid told him, "Do what you have to do," Serrano punched the kid in the face with his left hand, and said he was going to

---

[13] The defendant called no other witnesses to testify.

fight him first.  Serrano then said, "Yo Fifty," and the defendant stepped out to where they were standing.  Serrano handed him the gun, which the defendant pointed toward the sky.  The two men who had been in the automobile ran away.  The kid placed Serrano in a bear hug, lifted him up, slammed him on the ground, and began punching him in the face and stomach.  Serrano twice told the defendant to "give me my gun," but the defendant refused.  The kid then got off the ground, threw his jacket over his shoulder, and walked quickly out of the parking lot.

Serrano, still lying on the ground, told the defendant he was "a fucking punk," and asked him, "Why you let him beat me up like that?"  The defendant told him he should have defended himself.  Serrano then got up off the ground, said, "Give me my fucking gun," and pulled the gun away from the defendant's hand.  The defendant walked north up Oxford Street, crossed Haverhill Street, and went down Railroad Street, heading home.  He looked back, and he saw "Benji coming around the corner towards" where the kid was standing on Haverhill Street.  The defendant "kept walking," thinking to himself that "this ain't my problem" and that "everything was over."  As he was walking towards the other end of Railroad Street, he heard "a pop" but ignored it -- because he "didn't know what it was" -- and continued on to his mother's house.  The next morning, his mother woke him at 5 A.M.

and told him that someone had called her and that she needed to get him out because "they were going to kill" him.[14]

He admitted that he lied to Trooper Arakelian but said he did so because he was "scared" and "didn't want to get charged with something [he] did not do." The defendant maintained that false alibi even after Trooper Arakelian told the defendant that he knew the defendant was there, because the defendant "didn't want to rat on Benji."

Discussion. 1. Sufficiency and weight of the evidence. The defendant moved for a required finding of not guilty based on the insufficiency of the evidence at the close of the prosecution's case and at the close of all the evidence. The defendant claims that the judge erred in denying these motions, and that he is entitled to reversal of the murder conviction.

The defendant challenges the appellate standard that reviews a claim of insufficiency of the evidence. Under that standard, we determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). Commonwealth

---

[14] During cross-examination, the defendant claimed not to have known why anyone wanted to kill him, and he denied thinking that it had anything to do with the events of the night of April 1. Although he went to stay at the motel in Middleton on Friday, April 2, he testified that he did not know that the victim had been killed until Saturday, April 3.

v. St. Hilaire, 470 Mass. 338, 343 (2015), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). See Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). The defendant argues that we should instead determine whether the essential elements of the crime could have been found beyond a reasonable doubt by "a reasonable jury." The defendant cites in support of his position a law review article by then-Chief Judge Jon Newman of the United States Court of Appeals for the Second Circuit, who feared that "the word 'any' and the wholly gratuitous and potentially misleading underscoring of that word . . . can subtly shift an appellate court's attention from the correct construct of the reasonable jury to the quite incorrect construct of just one out of a distribution of reasonable juries." Newman, Beyond "Reasonable Doubt," 68 N.Y.U. L. Rev. 979, 992 (1993). Judge Newman's concern was that appellate courts under the "any rational trier of fact" formulation might "examine a record to satisfy themselves only that there is some evidence of guilt and . . . not conscientiously assess whether the evidence suffices to permit a finding by the high degree of persuasion required by the 'reasonable doubt' standard" (emphasis in original). Id. at 993.

The "any rational trier of fact" standard was stated by the United States Supreme Court in Jackson, 443 U.S. at 319, immediately after the Court stated that "the critical inquiry on

review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Id. at 318.  In Latimore, 378 Mass. at 677, we quoted both of these standards.  Neither the Supreme Court in Jackson nor this court in Latimore suggested that these two standards are substantively different.[15]  We decline to characterize them now as different in substance.  We regard them simply as alternative formulations of the same appellate standard.  We note that we have used the alternative to the "any rational trier of fact" formulation in earlier cases without intending any difference in the standard of review.  See, e.g., Commonwealth v. Rivera, 460 Mass. 139, 141 (2011) ("we review the evidence . . . to determine whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient for a reasonable jury to infer the existence of each essential element of the crime charged, beyond a reasonable doubt"); Commonwealth v. Ferguson, 384 Mass. 13, 15 (1981) ("we must

---

[15] Justice Stevens, joined by Chief Justice Burger and Justice Rehnquist, concurred in the judgment in Jackson v. Virginia, 443 U.S. 307, 339 (1979) (Stevens, J., concurring in judgment), because he saw no need for the Court to establish what he characterized as a "gratuitous directive to our colleagues on the federal bench" concerning a standard of review regarding the sufficiency of the evidence.  He did not call for a reasonable jury standard rather than an "any rational trier of fact" standard.

determine whether [the] evidence, considered in the light most favorable to the Commonwealth, was sufficient to permit a jury reasonably to infer the existence beyond a reasonable doubt of each essential element of the crime charged").  Under both formulations of the appellate standard, "it is not enough . . . to find that there was some record evidence, however slight, to support each essential element of the offense."  Latimore, supra.  Rather, the evidence must be sufficiently strong to permit a reasonable jury to find that each essential element of the charged offense was proved beyond a reasonable doubt.  See cases cited, supra.

Applying that standard, we conclude that the evidence in this case was sufficient to permit a reasonable jury to find the defendant guilty of the premeditated murder of the victim.  It is true, as the defendant argues, that Serrano had the stronger motivation to kill the victim, and that the medallion found at the scene of the killing belonged to Serrano, not the defendant.  But the jury were reasonably entitled to credit Estrella's eyewitness testimony that the shooter's chin was level with the center of the victim's forehead, which would make the defendant, not Serrano, the shooter, where the defendant was five inches taller than the victim and the victim was one inch taller than Serrano.  Also, where the defendant was seen wearing a hood when he pointed the gun at the victim during the fight, the jury

reasonably could have credited Estrella's observation that the shooter wore a hood on his head, and inferred that Serrano, whose hood was off his head before the shooting, would not likely have put his hood on had he given chase to the victim.[16] Although Serrano, not the defendant, had threatened the life of the victim for dating the woman who had been Serrano's girl friend, the jury reasonably could have inferred that Serrano brought the defendant to the encounter to assist Serrano in doing harm to the victim. After receiving the gun from Serrano, the defendant pointed it at the victim, and the jury reasonably could have inferred that part of the defendant's purpose in doing so was to prevent the victim from getting away. Thus, the jury reasonably could have inferred that, when the victim fled the scene, the defendant was the person who gave chase, especially where the defendant was holding the gun during the fight and the gunshot was heard within moments after Abreu ran from the scene of the fight. The jury also reasonably could have inferred that the victim pulled off Serrano's Virgin Mary medallion while he was wrestling with Serrano, and dropped it, along with the knife he was carrying, when he was shot.

---

[16] In fact, when Serrano was stopped by Officer Adames twenty minutes after the shooting, Serrano was not wearing a hood, even though it was raining hard at that time.

The consciousness of guilt evidence also points to the defendant as the shooter. The jury reasonably could infer that, regardless whether it was arrest or retaliation that he feared, he went to the motel and later left for Pennsylvania because he had shot and killed a person on the evening of April 1. Had he not been the shooter, it is unlikely that he would have felt the same need to flee. The jury could also reasonably have inferred that the closest he came to speaking the truth was when he told Officer Miner, "I was there," "I had the gun," and "Things just got crazy." This explanation is consistent with the defendant acting instinctively to chase the victim while he "had the gun," and shooting the victim because "[t]hings just got crazy." Although this evidence, viewed in its totality, does not eliminate the possibility that Serrano, not the defendant, was the shooter, the evidence is sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that the defendant, not Serrano, was the shooter. See Commonwealth v. Russell, 470 Mass. 464, 477 (2015) ("Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt").

Having reviewed the entire record in this case pursuant to G. L. c. 278, § 33E, we also address the defendant's contention that the verdict is against the weight of the evidence. Section

33E "does not . . . convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant . . . without the advantage of seeing and hearing the witnesses." Franklin, 465 Mass. at 916, quoting Commonwealth v. Jefferson, 416 Mass. 258, 265 (1993). "[F]or this court under the statute . . . to grant a new trial on the ground that the verdict was against the weight of the evidence, it must appear that the verdict . . . would work a miscarriage of justice . . . . It is not enough that the judge or judges, if on the jury, would have felt a reasonable doubt which the jury did not share." Franklin, supra, quoting Jefferson, supra at 266. In evaluating the weight of the evidence, we do not view the evidence in the light most favorable to the prosecution, and are free to consider the defendant's testimony at trial. See Commonwealth v. Ortiz, 470 Mass. 163, 163 (2014); Jefferson, supra at 267 (under G. L. c. 278, § 33E, we consider "the thrust of the evidence").

It is reasonable to conclude that the defendant's version of what happened after the fight ended between Serrano and the victim is not credible for various reasons. It is not credible that the victim simply walked away from the fight, where the defendant was pointing a gun at him. Nor is it credible that, after the victim left the scene of the fight, the defendant walked away and got as far as he said he did past the corner of

Haverhill and Oxford Streets when he heard the gun shot behind him at that corner; the victim had not run far from the scene of the fight before he suddenly turned to face the person chasing after him, and their encounter was brief before the shooting. Nor is it credible that he ignored the "pop" sound he admits he heard, or that he did not recognize the meaning of the "pop." Nor is it credible that he fled his home early on the morning of April 2 for reasons unrelated to what had happened at approximately 9 P.M. on April 1. In short, the weight of the evidence supports the jury's finding that the defendant, rather than Serrano, was the shooter.

2. Court room closure. After being convicted, the defendant moved for a new trial on the grounds that the court room had been improperly closed during jury empanelment, and that his trial counsel had been ineffective in failing to object to the closure. Following an evidentiary hearing, the trial judge concluded that "the defendant's mother and a friend of hers were excluded from the courtroom during the jury [e]mpanelment," and that "the [c]ourt itself, from the bench in open court, directed that the courtroom be cleared of spectators before the prospective jurors entered."[17] Defense counsel

---

[17] The judge noted that this was "consistent with what then had been a longstanding practice in the Lawrence Superior Court," and that nothing in the record "suggest[ed] that, if

"advised [the two spectators] that they would have to remain outside until [e]mpanelment was complete," which they did. He did not object to the closure and, after the jury were empaneled, stated that "the accused [was] satisfied with" the empanelment process.[18] Based on these facts, the judge denied the defendant's motion for a new trial, concluding that the defendant both waived his right to a public trial during jury selection and procedurally waived the claim of a violation of that right.

The defendant's right to a public trial under the Sixth Amendment to the United States Constitution applies to jury empanelment proceedings, and the violation of that right is structural error where the claim of error is properly preserved. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 105-106 (2010). See also Presley v. Georgia, 558 U.S. 209, 213 (2010). But "[w]here counsel fails to lodge a timely objection to the closure of the court room" -- as happened in this case -- "the defendant's claim of error is deemed to be procedurally waived."

pressed, the [c]ourt would have been unable to make an accommodation for the seating of the two women."

[18] The judge determined that the defendant had been aware of the court room closure, but the defendant's affidavit attested that it "did not occur" to him during trial that the public had been excluded from the court room; his attorney "never made [him] aware that . . . [he] had a right to a public and fair trial"; and he "did not waive [his] rights to a public trial."

Commonwealth v. LaChance, 469 Mass. 854, 857 (2014), petition for cert. filed, 83 U.S.L.W. 3768 (Mar. 20, 2015), citing Commonwealth v. Morganti, 467 Mass. 96, 102, cert. denied, 135 U.S. 356 (2014), and Commonwealth v. Lavoie, 464 Mass. 83, 87-88 & n.8, cert. denied, 133 S. Ct. 2356 (2013).  Having waived his claim of error regarding the denial of his right to a public trial during jury selection, the defendant after conviction may claim that his attorney provided ineffective assistance of counsel for failing to object to the closure of the court room. See LaChance, supra at 858; Morganti, supra at 103.  However, even if a defendant were to show that his or her attorney was deficient for failing to make a timely objection, the defendant would be entitled to relief in a murder case only if he or she can show that a substantial likelihood of a miscarriage of justice arose from the court room closure.  See Commonwealth v. Jackson, 471 Mass. 262, 269 (2015).[19]  "The structural nature of the underlying error does not automatically excuse the defendant from showing prejudice when advancing an unpreserved claim." LaChance, supra at 857.  Here, the defendant has not claimed

---

[19] Where the defendant has not been convicted of murder in the first degree and is not entitled to review under G. L. c. 278, § 33E, the defendant would need to show a substantial risk of a miscarriage of justice arising from counsel's failure to object to the closure of the court room during jury selection.  See Commonwealth v. LaChance, 469 Mass. 854, 857 (2014).

that the closure of the court room during jury selection was likely to have had any effect on the judgment.  See id. at 859, quoting Strickland v. Washington, 466 U.S. 668, 691 (1984) ("jury empanelment closed to spectators [other than jurors] and the defendant's family . . . will rarely have an 'effect on the judgment'").  Therefore, the defendant's public trial right claim fails because it was procedurally waived, and his claim of ineffective assistance of counsel fails because he has made no showing of prejudice.[20]

3.  Absence of instruction regarding honest mistake in identification.  The defendant also contends that he is entitled to a new trial because the trial judge did not instruct the jury of the possibility that an eyewitness who observed the shooting may have made an honest but mistaken observation of the shooter.

The defendant requested a five-part jury instruction on "mistaken observation," which the judge and defense counsel

---

[20] We note that the United States Court of Appeals for the First Circuit in United States v. Negrón-Sostre, 790 F.3d 295, 300-306 (1st Cir. 2015), ordered a new trial where defendants failed to object to the closure of the court room during jury empanelment and did not make any showing that the closure had any effect on the verdict.  The court concluded that the closure of the court room during the entirety of voir dire was "a plain and obvious error that, as a structural error, affected the defendants' substantial rights and seriously impaired the fairness, integrity, or public reputation of the proceedings." Id. at 306.  However, the court noted that "the government did not argue that the failure to object constitutes waiver."  Id. at 301 n.7.

characterized as an "amplification" of the instruction regarding eyewitness identification that this court approved in Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (Appendix) (1979), S.C., 419 Mass. 1006 (1995). The judge declared that he was not inclined "to do the amplification," but was inclined to give "the straight Rodriguez instruction," fearing that the additional detail in the amplified instruction would put him "more in the role of advocate than [he] ought to be." The judge agreed to defense counsel's request that his objection be noted for the record, even though defense counsel added that "there is no legal basis" for the objection "other than looking for an expansion."

At the charge conference that followed the close of evidence at trial, the judge said that he no longer thought that the Rodriguez instruction was appropriate because that instruction provides guidance regarding "an actual identification" and there was no identification of the shooter in this case. The judge said he would draft an instruction that would make clear to the jury that there was no identification of the shooter but there was testimony from Estrella regarding the "physical characteristics and attire" of the shooter, and set forth the factors the jury might use in assessing that testimony. Defense counsel agreed that "that would be appropriate."

The judge instructed the jury regarding eyewitness identification as he had promised.[21,22] Defense counsel did not object to this instruction or to any of the judge's jury instructions. The judge, however, did not include a jury

---

[21] The judge told the jury:

"The threshold fact that the Commonwealth must prove beyond a reasonable doubt . . . is that the defendant was the one who actually shot [the victim]. . . . The Commonwealth has not presented you with . . . any witness who has both testified that he saw the shooting and has identified the defendant as the shooter. Rather, . . . [t]he Commonwealth has presented you with a witness, Mr. Estrella, . . . who has testified that he saw the shooting. He gave an account of how it occurred, as well as an account of the physical appearance and dress of the shooter. In determining the reliability of that account, you consider all . . . that I've already mentioned as appropriate to consider in assessing the credibility and reliability of witness testimony in general and you will remember that, among those factors, you consider the opportunity of the witness to observe the relevant events. In that regard you consider in particular: how far or close Mr. Estrella was to the shooting; how long or short the time was that he had to observe the shooting; the lighting conditions; consider the presence or absence of obstruction to his vision; consider the extent to which Mr. Estrella focused his attention on the shooting and the shooter in particular. . . . Considering the reliability of witness testimony . . . you consider all of the evidence in the case, in determining whether in fact the defendant was the person who shot [the victim]."

[22] By giving a modified eyewitness identification instruction, the judge acted in accordance with the guidance we gave six years later in Commonwealth v. Franklin, 465 Mass. 895, 912 (2013), where we declared that a trial judge, if so requested, should provide the jury with a modified eyewitness identification instruction where "eyewitnesses have provided a physical description of the perpetrator or his clothing," even if no eyewitness positively identified the defendant.

instruction regarding the possibility of an honest but mistaken identification, even though the defendant had sought such an instruction in the fifth part of his proposed five-part jury instruction.[23]

In Commonwealth v. Pressley, 390 Mass. 617, 620 (1983), we declared that where "[i]dentification [is] crucial to the Commonwealth's case . . . [f]airness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it."  Here, where the facts permitted such an instruction and the defendant requested it, the judge should have instructed the jury about the risk of an honest but mistaken observation even in the absence of a positive eyewitness identification.  See Franklin, 465 Mass. at

---

[23] The fifth part of the instruction sought by the defendant provided as follows:

"In assessing the testimony of any witness relied upon by the Commonwealth to attempt to prove that [the defendant] committed a crime, you must consider the possibility of 'good faith error' by the witness.  That is, in addition to assessing the credibility of the witness, you must also consider whether the witness is honestly mistaken in his or her observations.  Even if you find that the witness is sincere and honest in his or her belief in what they observed, you must still return a verdict of not guilty unless you are convinced beyond a reasonable doubt that the observations testified to are reliable and accurate.  The burden is on the Commonwealth to prove[] beyond a reasonable doubt that the witness'[s] observations, however honest, [are] correct."

912. The defendant, however, did not object to the judge's jury instructions at trial, and therefore failed to alert the judge of the need for such an instruction.[24] Where the objection was not preserved, we consider whether the error produced a substantial likelihood of a miscarriage of justice. See, e.g., Commonwealth v. Smith, 449 Mass. 12, 17 (2007). We conclude that there was no such risk in this case because, even without the instruction, the jury reasonably would have understood that they needed to consider whether Estrella made a good faith, honest error in his observations of the shooting. The defendant never suggested that Estrella was lying; nor was there any evidence that Estrella had any motive to lie. The possibility that Estrella's testimony was based on an honest mistake was the focus of the defendant's cross-examination of Estrella and his

---

[24] The defendant argues that the error should be treated as preserved where the defendant earlier in the trial objected to the judge's decision not to give the defendant's proposed five-part instruction and the judge noted the objection. That objection focused on the judge's unwillingness to give an "amplification" of the instruction regarding eyewitness identification in Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (Appendix) (1979), S.C., 419 Mass. 1006 (1995), and his inclination to give a "straight" Rodriguez instruction, an inclination the judge later revised when he learned there was no positive identification of the defendant as the shooter. Where the Rodriguez instruction is silent as to the possibility of an honest but mistaken identification, defense counsel's objection to the judge's disinclination to give an amplified Rodriguez instruction would not reasonably have alerted the judge that the defendant objected to the absence of an honest, but mistaken, identification instruction.

closing argument.[25]  Given this context, the jury would have known what the missing instruction would have told them. Therefore, "we are substantially confident that, if the error had not been made, the jury verdict would have been the same." Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).

4.  Closing argument.  In her closing argument, the prosecutor told the jury that the defendant "can't tell you the truth because the truth doesn't help [the defendant].  The truth is . . . that [the defendant] was the shooter."  She later said that Estrella "[has] no reason to come in here and tell you anything but the truth.  And that's exactly what he did."  She concluded, "The defendant is the trigger man.  That is the truth . . . .  It was the defendant who murdered [the victim]."  The defendant argues that, in making these statements, the prosecutor improperly vouched for the accuracy of Estrella's testimony and improperly expressed her personal opinion as to the defendant's guilt.  Where, as here, the defendant did not object to these closing argument statements at trial, we determine whether the statements created a substantial likelihood of a miscarriage of justice that requires a new trial.  See, e.g., Commonwealth v. Sanders, 451 Mass. 290, 296 (2008) (where there was no objection to closing argument

---

[25] In closing argument, defense counsel referred to Estrella as a "[g]ood man [who] cares about the neighborhood."

statements in first-degree murder case, "we review to determine whether the statements were improper, and, if so, whether they created a substantial likelihood of a miscarriage of justice").

We agree with the defendant that the statements were improper. A prosecutor is free to provide the jury with the reasons why they should find a witness's observations to be accurate, but she cannot tell the jury that the witness speaks the truth. See id. at 297 ("[T]he prosecutor [may not] suggest that he has personal knowledge of, or vouch for, the credibility of a witness . . . [but may] state logical reasons why a witness's testimony should be believed"). See also Mass. G. Evid. § 1113(b)(3)(B) (2015) (impermissible in closing argument "to state a personal opinion about the credibility of a witness"). A prosecutor is also free to harness the key evidence and provide the jury with the reasons why they should conclude that a defendant was the shooter, but she cannot tell the jury that she knows it to be true that he was the shooter. See Sanders, supra at 296-297 ("A prosecutor may not express his personal belief in the testimony or suggest that he has knowledge independent of the evidence at trial . . . [but] may comment on and draw inferences from the evidence at trial"). See also Mass. G. Evid. § 1113(b)(3)(B) (impermissible in closing argument "to state a personal opinion about . . . the ultimate issue of guilt").

     We conclude, however, that the prosecutor's statements in this case, although improper, did not create a substantial likelihood of a miscarriage of justice.  A prosecutor's vouching for the truth of a witness's testimony or of the defendant's guilt is improper because it might suggest to the jury that the prosecutor has special knowledge, apart from the evidence presented at trial, that enables her to know that the witness is telling the truth or that the defendant committed the crime.  See Commonwealth v. Ciampa, 406 Mass. 257, 265 (1989), and cases cited.  But there was little danger that the jury would make that inference here because the prosecutor argued the reasonable inferences from the evidence at trial and did not suggest that she came to the "truth" based on anything other than the evidence at trial.  See Commonwealth v. Montgomery, 52 Mass. App. Ct. 831, 834 (2001), quoting Commonwealth v. Murchison, 418 Mass. 58, 60-61 (1994) ("prosecutor's assertions that the defendant was lying[] generally were accompanied by the words 'the evidence establishes,' and thus were 'expressed as a conclusion to be drawn from the evidence and not as a personal opinion'").  The prosecutor's statement that Estrella was telling the truth was made immediately after the statement that Estrella had "no reason" to do anything but tell the truth, and immediately before the prosecutor argued based on Estrella's testimony that the shooting was uniquely memorable for Estrella.

And immediately after the prosecutor's statement that "[t]he truth is . . . that [the defendant] was the shooter," the prosecutor said, "[T]he evidence tells us so." Because a reasonable jury would have understood the prosecutor's assertions of the "truth" to be based on the evidence at trial, there was no substantial likelihood of a miscarriage of justice.

5. Resentencing as a juvenile. The defendant was seventeen years old at the time of the crime. After conviction, he received the mandatory sentence for murder in the first degree under G. L. c. 265, § 2 -- life in prison without the possibility of parole. The defendant was sentenced in 2007, prior to Miller v. Alabama, 132 S. Ct. 2455, 2464 (2012), in which the United States Supreme Court held that the mandatory imposition of a sentence of life without the possibility of parole on an offender under the age of eighteen violates the Eighth Amendment to the United States Constitution, and prior to Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. at 671 & n.16, in which we held that the imposition of a sentence of life without the possibility of parole on an offender under the age of eighteen violates art. 26 of the Massachusetts Declaration of Rights. Because we give the "new" rules announced in Miller and Diatchenko retroactive effect, see Diatchenko, supra at 666, the defendant is entitled to be resentenced on his murder conviction to life in prison with the

possibility of parole.  See Commonwealth v. Ray, 467 Mass. 115,

140 (2014) (remanding case to Superior Court "for resentencing

consistent with Diatchenko").[26]

6.  Review under G. L. c. 278, § 33E.  We have reviewed the

entire record in this case pursuant to G. L. c. 278, § 33E, to

consider whether the interests of justice would be served by

ordering a new trial or reducing the defendant's sentence.

Where the verdict is not contrary to the weight of the evidence,

and where the defendant is entitled to have his sentence for

murder in the first degree reduced to life in prison with the

possibility of parole in light of Diatchenko because he was

---

[26] The Commonwealth concedes that the defendant must be
resentenced to life with the possibility of parole on his murder
conviction.  But in addition to murder in the first degree, the
defendant was convicted of unlawful possession of a firearm in
violation of G. L. c. 269, § 10 (a), and sentenced to one year
in a house of correction, to run concurrently with the life
sentence for murder in the first degree, and with credit for
time served, which at the time of sentencing was already 1,001
days.  We have not addressed the issue whether a convicted
offender entitled to resentencing under Diatchenko v. District
Attorney for the Suffolk Dist., 466 Mass. 655, 671-674 (2013),
S.C., 471 Mass. 12 (2015), may also be resentenced on
convictions in which he did not receive life in prison without
the possibility of parole.  Cf. Commonwealth v. Costa, 472 Mass.
139, 143-146 (2015) (at resentencing of juvenile defendant who
had been convicted of two murders and sentenced to two
consecutive life terms without the possibility of parole, judge
may revisit whether sentences should be consecutive or
concurrent).  We need not address that issue here, because the
Commonwealth at oral argument indicated that it would not seek
resentencing on the firearms conviction, and because the
defendant has already completed his sentence on the firearms
conviction.

under the age of eighteen at the time of the shooting, we decline to exercise our authority under G. L. c. 278, § 33E.

Conclusion.  We affirm the defendant's convictions of murder in the first degree and carrying a firearm without a license, and affirm the order denying the defendant's motion for a new trial, but remand for resentencing consistent with Diatchenko.

So ordered.