NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10075


COMMONWEALTH  vs.  PABLO VARGAS.



Hampden.     March 11, 2016. - August 30, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.[1]


Homicide.  Constitutional Law, Admissions and confessions,
    Voluntariness of statement, Waiver of constitutional
    rights, Assistance of counsel, Public trial.  Due Process
    of Law, Assistance of counsel, Interpreter.  Evidence,
    Admissions and confessions, Voluntariness of statement,
    Hearsay.  Waiver.  Telephone.  Defense of Others.  Self-
    Defense.  Interpreter.  Practice, Criminal, Admissions and
    confessions, Voluntariness of statement, Waiver, Assistance
    of counsel, Instructions to jury, Hearsay, Motion to
    suppress, New trial, Interpreter, Public trial, Capital
    case.



    Indictment found and returned in the Superior Court
Department on November 2, 2004.

    A pretrial motion to suppress evidence was heard by Daniel
A. Ford, J.; the case was tried before Francis R. Fecteau, J.;
and a motion for a new trial, filed on December 23, 2013, was
heard by C. Jeffrey Kinder, J., and a motion for reconsideration
was also heard by him.

_____

    [1] Justice Cordy participated in the deliberation on this
case and authored this opinion prior to his retirement.  Justice
Spina participated in the deliberation on this case prior to his
retirement.

John M. Thompson for the defendant.

Katherine E. McMahon, Assistant District Attorney, for the Commonwealth.

CORDY, J.  There is no dispute that on the night of September 23, 2004, the victim, Tremayne King, was killed by the defendant, Pablo Vargas.  The defendant stabbed the victim eight times during an altercation at the residence of the victim's estranged wife, Yanira Rodriguez, who was the defendant's girl friend.  At trial, the defendant sought to rebut the charge of murder in the first degree on the theory of self-defense, alleging that he fought and killed the victim because he feared for his life.

On May 24, 2006, a Hampden County jury convicted the defendant of murder in the first degree on a theory of extreme atrocity and cruelty, rejecting the Commonwealth's alternative theory of premeditation.  In December, 2013, the defendant moved for a new trial, which was denied, as was his motion for reconsideration thereof.

On appeal from his conviction and from the denial of his motion for a new trial, the defendant claims that (1) his statement made during police questioning shortly after the altercation should have been suppressed; (2) the trial judge erred in excluding relevant so-called Adjutant evidence of the victim's history of violence, see Commonwealth v. Adjutant, 443

Mass. 649, 664 (2005); (3) the judge erred in admitting certain testimony concerning the defendant's statements made to a third party; (4) the judge erred in denying his request for an instruction on defense of another; (5) the judge's jury instructions on malice, self-defense, and voluntary manslaughter were erroneous and created a substantial likelihood of a miscarriage of justice because they allowed the jury to convict the defendant without considering mitigating circumstances; (6) a qualified interpreter should have been appointed to assist with the testimony of Rodriguez, who was a witness to the altercation; (7) his right to a public trial was violated when the court room was closed during jury selection; (8) trial counsel was ineffective; and (9) evidence that was newly discovered after trial warranted the granting of a new trial. The defendant also requests that we exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the verdict of murder in the first degree to voluntary manslaughter.

Although our review of the record does not reveal any errors that would warrant a new trial, the circumstances of this case persuade us that a reduction of the defendant's conviction from murder in the first degree to voluntary manslaughter is more consonant with justice. We therefore vacate the defendant's conviction of murder in the first degree and his sentence, and we remand the case to the Superior Court for the

entry of a verdict of guilty of voluntary manslaughter and for imposition of sentence.

Background. We recite the facts in the light most favorable to the Commonwealth, reserving certain details for our analysis of the issues raised on appeal.

At 11:48 P.M. on September 23, 2004, Springfield police Detective Norman Shink and three other officers arrived at an apartment building on Bristol Street in Springfield. Shink saw a man, who was later identified as the defendant, in front of an apartment on the second floor. The defendant lifted his shirt, revealing a bloody knife tucked into his waistband, and said, "This is the knife I used to stab him. Take it. Take it. He was beating me real bad. I had no choice. It was self-defense."

Rodriguez lived in the apartment on Bristol Street with her three children. She was married to the victim, but the two were estranged. The victim had enlisted in the National Guard, and on July 10, 2004, was assigned to Fort Drum, in New York, to train for deployment to Iraq. At that time, the victim and Rodriguez separated. The victim left a number of personal belongings stored at the apartment, including several handguns.

In August, 2004, the defendant began staying at Rodriguez's apartment, and he was there on the evening of September 23. That day, Rodriguez received a telephone call from the victim,

who had received a pass from the National Guard and planned to return to the apartment to retrieve his belongings. The victim did not specify when he would be arriving.[2]

The defendant was present when Rodriguez spoke with the victim. She discussed the conversation with him and encouraged him to leave before the victim arrived. The defendant did not do so.

At approximately 11:30 $\underline{P}.\underline{M}$. that evening, Rodriguez was sitting on a couch watching television in the living room. She heard a sound at the door and observed a hand reaching in through the partially opened door and sliding the chain lock up to release it and gain access to the apartment. At this point, the victim burst in and attacked her, hitting her with his fists as she covered her face with her arms. The defendant, who was in the bedroom at the time, came into the living room and said something to the victim. The victim ran at the defendant, knocking him back into the bedroom and jumping on top of him. The defendant shouted for Rodriguez to telephone the police, and Rodriguez ran to an apartment next door. One of the occupants

---

[2] On September 23, the victim drove with a fellow soldier to Springfield from Fort Drum. The soldier was called as a witness for the Commonwealth. He testified that while en route, the victim made two telephone calls. The first was to a female (who the witness did not know), to whom the victim stated falsely that he was not coming to Springfield that day because his pass had been delayed. In the second call, he told the person that he was coming home to get divorce papers, pick up his weapons, and surprise his wife.

answered the door; Rodriguez begged him to telephone 911 and stated that the victim had a firearm, although she had not seen the victim with any weapon. When she returned to her apartment, Rodriguez saw the victim lying on the couch, bleeding. No firearm was found in the victim's possession.

The victim went into cardiac arrest and died while being transported to the hospital. A medical examiner determined that of the eight stab wounds sustained by the victim, four had been lethal. One wound to the victim's left upper arm was defensive.

Discussion. 1. Motion to suppress statement. The defendant was arrested and interrogated by Sergeant Roy Carter and Shink at the Springfield police department in the early hours of September 24, 2004. The interview was recorded.[3,4]

---

[3] During the interview, the defendant shared his version of events, including that he saw the victim carrying a gun and that he used the knife in self-defense. The defendant described the gun as black and gray, which was similar to one of the two guns found by police during a search of the victim's personal belongings (which had been stored at the apartment) and described to the jury as "two-tone." The defendant's statement indicated the following: A man whom the defendant did not recognize barged into Rodriguez's apartment while the defendant and Rodriguez were sitting on the couch. The man attacked Rodriguez and then proceeded to charge at the defendant. The man hit the defendant, tackled him, and jumped on top of him. The defendant saw the man had a gun, "freaked out," and grabbed a knife to defend himself. The defendant told the man to stay back, and when he did not do so, the defendant began to swing the knife. The two fell to the ground, at which point the defendant noticed that the man began to lose strength due to being stabbed.

Prior to questioning, Carter read and presented the defendant with the Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). When Carter instructed the defendant as to his right to an attorney,[5] the defendant asked, "Is there a lawyer here present?" Carter responded, "No, there isn't." Carter then proceeded with his presentation of the Miranda rights, including that the Commonwealth would provide a lawyer if the defendant could not afford one. Carter read the Miranda warnings for a second time, the defendant initialed the warnings as they were read, and the defendant indicated that he wished to speak to police.

---

[4] The recording was played at trial. In its closing argument, the Commonwealth characterized the defendant's statement as self-serving, and specifically attempted to undermine the credibility of the self-defense theory by highlighting various inconsistencies between the statement and reality. The prosecutor stated: "One of the most important pieces of evidence you will have in the jury deliberation is a copy of the [recording] of the statement taken by the police at the police station."

[5] The Miranda warning form for the Springfield police department, see Miranda v. Arizona, 384 U.S. 436 (1966), contained an error as to the right to counsel warning. The document provided: "You have the right to talk for advice before we ask you any questions and to have him with you during questioning." Sergeant Roy Carter verbally corrected this error, as his instruction was, "[Y]ou have the right to talk to a lawyer for advice before we ask you any questions and you can have him with you during questioning."

The form also presented the defendant with the Miranda rights prior to informing him of his right to use a telephone.

The police then notified the defendant of his right to use the telephone. The defendant indicated that he intended to use the telephone, and Carter told him that he would be allowed to do so. The defendant checked the box indicating that he had used the telephone, and signed that he had been notified of his rights. The space on the form for timing of the defendant's telephone call was left blank, and the defendant never made a telephone call.

Prior to trial, the defendant moved to suppress his statement. He argued that the statement was obtained in violation of his Fifth Amendment rights,[6] specifically that (1) he had not made a voluntary waiver of his Miranda rights due to his lack of language skills; (2) his waiver was not knowing because of the faulty Miranda warning; and (3) his statement,

---

[6] The defendant's motion did not specifically address the defendant's cognate protections under art. 12 of the Massachusetts Declaration of Rights. The Commonwealth argues that any arguments under art. 12 have therefore been waived. See Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004) ("A pretrial motion shall state the grounds on which it is based and shall include in separately numbered paragraphs all reasons, defenses, or objections then available, which shall be set forth with particularity"). See also Commonwealth v. Mubdi, 456 Mass. 385, 389 (2010) (under rule 13 [a] [2], affidavits "must be sufficiently detailed to give fair notice to the prosecution"). Article 12 was, however, addressed at the motion to suppress hearing. The defendant's art. 12 claims are not waived; issues of notice are irrelevant, as art. 12 guarantees the same rights as does the Fifth Amendment, see Commonwealth v. Clarke, 461 Mass. 336, 337 (2012), and the motion judge relied on cases interpreting both the Massachusetts Declaration of Rights and the United States Constitution in denying the motion to suppress.

"Is there a lawyer here present?" constituted an invocation of his right to counsel, which invocation was not scrupulously honored.[7] At an evidentiary hearing on the issue, the defendant, Carter, and Shink testified. Carter and Shink both testified that the defendant was eager to share his version of events. The judge credited the officers' testimony, and, after reviewing the recording of the interview, denied the motion. The judge found that the defendant had been advised of his rights, that he had a sufficient command of English to understand and waive those rights, that he had been informed of his statutory right to use the telephone, and that he had not made an unambiguous request for counsel.

On appeal, the defendant challenges the denial of his motion to suppress on three grounds: (1) the police did not scrupulously honor his invocation of his art. 12 right to counsel; (2) his statutory right to use the telephone, under, G. L. c. 276, § 33A, was intentionally violated; and (3) he did not make a knowing and voluntary Miranda waiver.

---

[7] The defendant's motion to suppress his statement did not specifically set forth the purported G. L. c. 276, § 33A, violation of his telephone rights. See Mass. R. Crim. P. 13 (a) (2). However, the claim that G. L. c. 276, § 33A, was violated was addressed by the motion judge, and a suppression challenge on that ground is therefore not waived. See Mass. R. Crim. P. 13 (a) (2) ("Grounds not stated which reasonably could have been known at the time a motion is filed shall be deemed to have been waived, but a judge for cause shown may grant relief from such waiver").

a. <u>Statutory right to use telephone</u>. Under G. L. c. 276, § 33A, "an arrested person [must] be informed of his right to use the telephone as soon as reasonably practicable after arrival at the station." <u>Commonwealth</u> v. <u>Bouchard</u>, 347 Mass. 418, 420 (1964). "The exclusionary rule applies to intentional deprivation by police of a defendant's rights under G. L. c. 276, § 33A." <u>Commonwealth</u> v. <u>Hampton</u>, 457 Mass. 152, 155 (2010).

There was not an intentional deprivation of the defendant's statutory telephone rights. The defendant was informed of his right to use the telephone after waiving his Miranda rights. Carter asked the defendant if he "intend[ed] to use the [tele]phone." The defendant said, "Yes." Some confusion followed, as there was no indication that the defendant wanted to use the telephone at that moment or after he spoke with police. The record does reflect, however, that the defendant was eager to speak to police. In any event, although the defendant was not informed of his right to use the telephone for at least one hour and twenty-five minutes after he had been brought to the station,[8] "he was informed before the inculpatory

---

[8] Carter testified that the defendant arrived at the police station at 12:20 <u>A</u>.<u>M</u>. The defendant was handcuffed to a chair in the detective bureau. The recording of the interview indicated that it began at 1:40 <u>A</u>.<u>M</u>., and, roughly five minutes into the interview, the defendant was informed of his right to use the telephone.

statement was given." Commonwealth v. Espada, 450 Mass. 687, 702 (2008). Contrast Commonwealth v. Jones, 362 Mass. 497, 503 (1972) (statement suppressed where police waited more than one hour to inform defendant of right to make telephone call and damaging confrontation occurred in interim period). There was no error.

b. Right to counsel. The defendant claims that his question, "Is there a lawyer here present?" asked while Carter was reading him his Miranda rights, was an invocation of his right to counsel, and should have resulted in the cessation of the interrogation. His subsequent statements, he argues, should therefore have been suppressed. We disagree.

Miranda, 384 U.S. at 444, requires that "[p]rior to any questioning, the [suspect] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda "protects both Fifth Amendment rights and rights guaranteed under art. 12" (citation omitted). Commonwealth v. Clarke, 461 Mass. 336, 345 (2012). Once a suspect invokes his or her right to counsel, "all interrogation must cease until counsel is made available, unless the [suspect] himself [or herself] reinitiates further communication with the police." Commonwealth v. Hoyt, 461 Mass. 143, 149 (2011)

The defendant's question concerning whether an attorney was present at the police station was, at best, ambiguous as to whether he was invoking his right to counsel.[9]  In response, Carter properly sought to clarify any ambiguity by repeating that the defendant had a right to counsel prior to questioning, advising him that he would be provided with an attorney if he could not afford one, and asking him if he understood those rights.  The defendant told Carter that he did, and proceeded to initial the document to indicate his acknowledgement and then to assent to police questioning.  There was no error in the judge's ruling that the defendant had not invoked his right to counsel.

c.  Knowing and voluntary waiver of rights.  The defendant twice heard and then signaled comprehension of his Miranda rights.  When the defendant asked if there was a lawyer present during the reading of his rights, the police responded accurately and promptly.  Prior to questioning, Carter verified that the defendant was not intoxicated and that he could

---

[9] The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  Davis v. United States, 512 U.S. 452, 459 (1994).  See Commonwealth v. Vincent, 469 Mass. 786, 796 (2014) ("defendant's statements concerning possibly needing or wanting a lawyer were ambiguous and equivocal, and would not reasonably be understood in the circumstance to constitute an invocation of the right to counsel" [quotations and citation omitted]).

comprehend the English language.[10]  The motion judge found and the record reflects that the defendant was eager to share his version of the events with police.  We note also that the defendant's statement to the police was self-serving, in that it supported his theory of defense.  There was no error, and the denial of the defendant's motion to suppress is affirmed.

2.  Adjutant evidence.  At trial, the defendant sought to introduce, under Adjutant, 443 Mass. at 664, evidence concerning the victim's history of violence in order to show that the victim was the initial aggressor in the altercation that resulted in the victim's death.  That evidence would largely have consisted of testimony concerning the victim's prior violence toward Rodriguez.  The trial judge determined that the issue as to the initial aggressor was not in dispute, and did not allow the evidence to be admitted for that purpose.[11]

---

[10] The defendant indicated that he had trouble reading and writing English.  However, the defendant told Carter that he had secured his "GED," which we interpret as a reference to passing a general education development test, and Carter testified at the motion to suppress hearing that the defendant had "[n]o difficulty at all" with the English language.  The motion judge found that "the defendant is fluent in English" and that "language was simply not an impediment to the interview that took place."

[11] Rodriguez was, however, allowed to testify to violent acts committed by the victim against her, to the extent that she had conveyed those acts to the defendant, which she testified she had.  The trial judge instructed the jury:

"[W]here the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." Adjutant, 443 Mass. at 664. The definition of "first aggressor" pertains not only to "the person who initiated the confrontation, but also the person who initiated the use or threat of deadly force, as 'resolution of both issues may assist the jury in deciding whether the prosecution has met its burden of proving that the defendant did not act in self-defense.'" Commonwealth v. Camacho, 472 Mass. 587, 592 (2015), quoting Commonwealth v. Chambers, 465 Mass. 520, 529-530 (2013).

Evidence of the victim's history of violence would not have bolstered the defendant's case, as the question of initial aggressor was never at issue. There was no conflicting evidence as to the series of events leading up to the victim's death. The only accounts of the altercation came from the defendant (through his statement to police) and Rodriguez, who was called as a Commonwealth witness, both of which were consistent in

"You are permitted to hear these out-of-court statements not for the truth of the matters contained, but for the fact of a conversation . . . [The information] may be considered by you on the issue of the defendant's state of mind or his state of knowledge concerning those aspects, those events."

their portrayal of the victim as the initial aggressor.[12]  The jury also heard substantial evidence supporting the defendant's self-defense theory:  the victim was significantly larger than the defendant;[13] and the victim had been trained in unarmed combat, including the incapacitation and killing of individuals, with or without weapons.[14]  Based on that evidence, and given

---

[12] Rodriguez's testimony as to the portion of the altercation that she witnessed included the following exchange on cross-examination:

Q.:  "[A]fter your husband, burst into that apartment on the night of his death, you said that he grabbed [the defendant,] correct?"

A.:  "Yes, sir."

. . .

Q.:  "Was your husband on top of him?"

A.:  "Yes, sir."

Q.:  "Did your husband have his hand on [the defendant]?"

A.:  "Yes, sir."

Q.:  "Was [the defendant] able to get away from [the victim]?"

A.:  "No, sir."

[13] The victim was six feet tall and approximately 180 pounds, while the defendant was five feet, six inches tall and weighed 114 pounds when he was booked.

[14] When the judge charged the jury, he instructed that "deadly force" can be used in self-defense where "the person using the weapon or deadly force [has] a reasonable apprehension of great bodily harm or death and a reasonable belief that no other means would suffice to prevent such harm."  The jury were

that there was no deadly weapon found with the victim, the assumption required to make the defendant's self-defense case was that the victim immediately used deadly force (with his hands and body) when the altercation began, and a deadly weapon was not necessary.  The defendant's proposed history of violence evidence would therefore have been both cumulative and unnecessary in making a case of self-defense, see Adjutant, 443 Mass. at 663, and there was no "great[] danger that the exclusion of the evidence concerning the victim's violent acts" prejudiced the defendant.  Camacho, 472 Mass. at 593.[15]

---

allowed to "consider evidence of the relevant physical capability of the combatants, how many persons were involved on each side, the characteristics of any weapons used, the availability of rooms to maneuver, or any other factors . . . relevant to the reasonableness of the defendant's conduct under the circumstances."

[15] The defendant argues that, in its closing, the Commonwealth put at issue the initial aggressor question. During closing arguments, the prosecutor described the defendant and Rodriguez's versions of events as "wildly exaggerated" and posed an alternative series of events, indicating that the defendant may have been waiting for the victim so as to "ambush him" with a knife.  The prosecutor went on to say that "[c]ommon sense should tell you [Rodriguez and the defendant] were waiting and [the defendant] was prepared and ready for the eventuality that [the victim] would walk in and be upset to find the defendant and his wife."  This postulation did not change the evidence presented in terms of who was the initial aggressor. And, to the extent that the Commonwealth's "ambush" argument was intended to persuade the jury that the murder was premeditated, the jury rejected that theory.

3.  <u>Jury instructions</u>.[16]  The jury were instructed as to the prerequisites for a guilty finding of murder in the first degree, murder in the second degree, and manslaughter.  As to murder in the first degree, the jury were instructed on the theories of deliberate premeditation and extreme atrocity or cruelty.  The jury returned a verdict convicting the defendant or murder in the first degree under the theory of extreme atrocity or cruelty.  The defendant now claims error with the judge's decision, over his objection, not to instruct the jury on defense of another, and, for the first time, objects to various portions of the self-defense and homicide instructions, particularly those related to malice and voluntary manslaughter.

a.  <u>Defense of another</u>.  The defendant argues that the judge erred by refusing to instruct the jury on the question of defense of another, given that he intervened after the victim's attack on Rodriguez.[17]  Because the defendant's exception was

_____

[16] The homicide jury instructions in this case were based on the 1999 Model Jury Instructions on Homicide.

[17] In declining to instruct the jury on defense of another, the judge reasoned:

     "The way I was looking at the evidence, I don't think it supports it because the evidence would indicate that the defendant appeared not to have armed himself until he himself was being attacked and wasn't intervening in the attack on another while armed.  So I think the evidence tends to support self-defense, not defense of another.  It may have initiated that way, the action may have started

preserved, we review the defendant's claim for prejudicial error. See Commonwealth v. Allen, 474 Mass. 162, 168 (2016).

Defense of another is warranted if "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself." Commonwealth v. Scott, 463 Mass. 561, 576 (2012), quoting Commonwealth v. Young, 461 Mass. 198, 208 (2012). "The reasonableness of the belief is from the point of view of the actor and not of the third party, such that whether the third party was actually entitled to use self-defense, or believed the use of force to be necessary, is not at issue." Scott, supra. "The actor's justification is lost if he uses excessive force, e.g., aggressive or deadly force unwarranted for the protective purpose." Id., quoting Commonwealth v. Martin, 369 Mass. 640, 649 (2012).

The judge did not err in finding that the defendant was not entitled to an instruction on the use of force in defense of Rodriguez. Even viewing the evidence in the light most favorable to the defendant, Scott, 463 Mass. at 577, the evidence does not support an objective basis on which a

---

that way, but in terms of self-defense, the deadly force, I think that was done."

reasonable person would have believed that the defendant was justified in using deadly force in defense of Rodriguez. The evidence tended to show that, when the defendant stabbed the victim, Rodriguez had left the apartment.

b. Other jury instruction issues. The defendant, for the first time on appeal, claims error as to various portions of the jury instructions, particularly as to flaws in the self-defense and homicide instructions. Because the defendant did not object to the jury instructions, we review them to determine whether there was a substantial likelihood of a miscarriage of justice. See Commonwealth v. Valentin, 474 Mass. 301, 305 (2016). When reviewing jury instructions, we "evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words" (citation omitted). Commonwealth v. Young, 461 Mass. at 207. We do not consider words from the instructions in bits and pieces or in isolation from one another. See id. If there is an error in the jury instructions, a new trial is called for unless we are "substantially confident that, if the error had not been made, the jury verdict would have been the same." Commonwealth v. Penn, 472 Mass. 610, 626 (2015), cert. denied, 136 S. Ct. 1656 (2016), quoting Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1988).

i.  Self-defense.  The defendant takes issue with the following instruction:  "A person may not use force in self-defense until he has availed himself of all proper means to avoid physical combat."  The defendant argues that, under the circumstances of this case, the duty to retreat instruction should have been limited to the time frame of the face-to-face confrontation.  The flaw was exacerbated because in closing argument, the prosecutor asked if the defendant did "all he could to avoid physical combat when he told [Rodriguez's neighbor] he wasn't leaving even though they knew [the defendant] was coming home[.]"  This question, the defendant argues, in conjunction with the instruction, created the implication that if the defendant did not leave when he learned that the victim was coming, he was not justified in using any force to defend himself.

We find no error with the instruction, which tracked the Model Jury Instructions on Homicide 55-56 (1999), and clearly and correctly conveyed the applicable law.  The judge instructed the jurors that the Commonwealth had the burden of proving that the defendant did not act in self-defense and that the time frame in which the defendant must have been in fear of bodily harm was during the altercation.  Specifically, the jury were instructed that "[t]he proper exercise of self-defense arises from necessity and ends when necessity ends."

ii. <u>Homicide</u>. The judge instructed the jury on murder in the first degree (on theories of deliberate premeditation and extreme atrocity or cruelty) and on murder in the second degree. As to both, the judge instructed on the prerequisite that the Commonwealth must prove malice, and on the possibility of a justified killing in self-defense. See Model Jury Instructions on Homicide 8, 12, 20-21 (1999). During the course of the instructions on murder in the first and second degrees, the judge instructed the jury three times that they are "permitted" but not required "to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice." The dangerous weapon instruction was also consistent with the Model Jury Instruction on Homicide 61 (1999). The judge then instructed the jury on voluntary manslaughter and the circumstances that mitigate murder to manslaughter. He stated:

> "Now going to move to the third form of homicide as a lesser included offense within the charge of murder, and that being manslaughter. In order to prove that the defendant acted with malice, the Commonwealth must prove beyond a reasonable doubt the absence of certain mitigating circumstances. Mitigating circumstances are circumstances which lessen a defendant's culpability for an act. Both are crimes of murder, and voluntary manslaughter requires proof of an unlawful killing, but the killing may be the crime of voluntary manslaughter if it occurred under mitigating circumstances. <u>So that if the Commonwealth cannot prove beyond a reasonable doubt that the defendant acted with malice, in order to obtain a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of these mitigating circumstances</u>. Based on the evidence of this case,

mitigating circumstances you must consider are heat of
passion upon a reasonable provocation; second, heat of
passion induced by sudden combat; third, excessive
force -- excessive use of force in self-defense."
(Emphasis added to highlight variances from the Model
Jury Instruction on Homicide 27 [1999][18]).

After introducing voluntary manslaughter, the judge

outlined each of the three mitigating circumstances, the absence

of which the Commonwealth had to prove.  The third of those

circumstances was excessive use of force in self-defense.  The

instruction as to the excessive use of force in self-defense

mitigating circumstance was as follows:

"[T]he Commonwealth has the burden of proving beyond a
reasonable doubt the absence of self-defense.  If the
Commonwealth fails to prove beyond a reasonable doubt
the absence of self-defense, your verdict must be not
guilty with respect to the crimes of murder or
voluntary manslaughter.  If, however, the Commonwealth
does prove excessive force in an effort to defend
himself, you'd be justified in finding the defendant
guilty of voluntary manslaughter."

---

[18] The model jury instruction provides:

"In order to prove that the defendant acted with
malice, the Commonwealth must prove beyond a reasonable
doubt the absence of certain mitigating circumstances.
Mitigating circumstances are circumstances which lessen a
defendant's culpability for an act.  Both the crimes of
murder and voluntary manslaughter require proof of an
unlawful killing, but the killing may be the crime of
voluntary manslaughter if it occurred under mitigating
circumstances so that the Commonwealth cannot prove beyond
a reasonable doubt that the defendant acted with malice.
In order to obtain a conviction of murder, the Commonwealth
must prove beyond a reasonable doubt the absence of [these]
mitigating [circumstances]" (emphasis added).

Model Jury Instructions 27 (1999).

The defendant argues that errors permeated the jury instructions and allowed the jury to convict the defendant of murder in the first degree without considering any of the mitigating circumstances, essentially removing manslaughter as an option for the jury, and that such errors warrant a new trial. We disagree.

We note first that each of the distinct jury instructions, taken alone, were not erroneous. The use of a deadly weapon instruction, interposed three times during the instructions on murder in the first and second degrees, was consistent with the model instructions both in terms of form and location. Model Jury Instruction on Homicide 8, 12, 21, 61. We have repeatedly approved of a similar instruction that "tells[s] the jury they may, rather than they must, infer malice from use of a dangerous weapon." Commonwealth v. Young, 461 Mass. at 212, and cases cited. The deadly weapon instruction in this case, which "permitted" but did not "require[]" the jury to infer malice from the use of a dangerous weapon, was not erroneous.

As noted above, the general description of the manslaughter charge varied in minor, though not insignificant, ways from the model instruction. The sentence, "So that if the Commonwealth cannot prove beyond a reasonable doubt that the defendant acted with malice, in order to obtain a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of

these mitigating circumstances," taken alone, seems to imply both that (1) a finding of malice would preempt the consideration of mitigating factors and require a finding of murder, and (2) the Commonwealth could prove murder in the first degree without showing malice, but instead proving that there were no mitigating circumstances. We do not, however, review the words of an instruction in isolation from each other, particularly where we are reviewing the instructions for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Dyer, 460 Mass. 728, 749 (2011), cert. denied, 132 S. Ct. 2693 (2012). See also Commonwealth v. Oliveira, 445 Mass. 837, 844 (2006). Just two sentences prior, the judge instructed, "In order to prove that the defendant acted with malice, the Commonwealth must prove beyond a reasonable doubt the absence of certain mitigating circumstances." The instruction clearly delineates the proper rule: malice and mitigating circumstances are mutually exclusive. See Commonwealth v. Boucher, 403 Mass. 659, 661-662 (1989). And earlier, the judge had specifically instructed that, in order to prove murder in the first degree, "[t]he second element the Commonwealth must prove beyond a reasonable doubt is that the killing was committed with malice." The jury were instructed that the absence of mitigating circumstances alone does not warrant the return of a verdict of murder in the first degree.

The use of excessive force in self-defense instruction was consistent with the Model Jury Instruction on Homicide 30-31, and is substantially similar to the instructions given in Commonwealth v. Britt, 465 Mass. 87, 96 (2013), and Commonwealth v. Bolling, 462 Mass. 440, 448 (2012). As in the present case, the defendants in those cases argued that the use of the permissive phrase "would be justified," as opposed to the mandatory "must," gave the jury the erroneous impression that, even if they found excessive use of force in self-defense, murder was still a possible verdict. See Britt, supra; Bolling, supra. We conclude, as we did in those cases, that the instruction in the present case, considered in its entirety, was not erroneous. See Britt, supra; Bolling, supra.

Finally, the instruction that the jury must convict the defendant of the most serious crime proved beyond a reasonable doubt was consistent with the model instruction and was not erroneous. See Model Jury Instructions on Homicide 65-66 (1999). We are also convinced that, taken as a whole, the instructions, although flawed, were not erroneous.[19,20] In the

---

[19] Because we conclude that the jury instructions were not erroneous, there is also no merit to the defendant's claim of ineffective assistance of counsel predicated on defense counsel's failure to object to these instructions.

[20] The defendant also cites to Commonwealth v. Barnacle, 134 Mass. 215, 216 (1883), for the proposition that the jury were not instructed that the victim need not be armed in order for

future, we urge judges to follow the model jury instructions verbatim to avoid such flaws and ensure a smooth recitation of the jury charge.

4.  Hearsay testimony.  As part of the Commonwealth's case, the prosecutor elicited testimony from Rodriguez concerning an occasion in which she had shown the defendant one of the victim's handguns.  When the defendant handled the handgun, he did so through his shirt.  The prosecutor asked Rodriguez if the defendant indicated why he was holding the gun in that manner.  Rodriguez, after first testifying that the defendant did not explain why he was doing so, reviewed her police statement and confirmed that she had told police that the defendant was holding the handgun in that manner in order to avoid getting fingerprints on the gun.  The defendant objected various times during the line of questioning, and we assume, without deciding, that he did so when the Commonwealth elicited Rodriguez's testimony about her police statement.  On appeal, the defendant

---

the defendant's use of deadly force to be justified.  The record does not support this argument; the judge specifically instructed the jury:

> "In considering the issue of reasonableness of any force used by the defendant, you may consider evidence of the relevant physical capabilities of the combatants, how many persons were involved on each side, the characteristics of any weapons used, the availability of rooms to maneuver, or any other factors you deem relevant to the reasonableness of the defendant's conduct under the circumstances."

claims that the testimony was impermissible hearsay and that it was a gratuitous attack on the defendant's character.

There was no error. The evidence was relevant to explain how the defendant was able to describe one of the defendant's guns. Moreover, the testimony was not hearsay, see Commonwealth v. Cole, 473 Mass. 317, 324-325 (2015) (extrajudicial statements by party opponent are not hearsay); Mass. G. Evid. § 801(d)(2)(A) (2016).

5. Motion for a new trial. In his motion for a new trial, the defendant argued that (1) his due process rights were violated when the trial judge did not appoint a qualified Spanish interpreter for Rodriguez; (2) his right to a public trial was violated when the court room was closed during jury selection; (3) he received ineffective assistance of counsel; and (4) there was newly discovered evidence that might have affected the outcome of his trial.[21] The motion judge (who was not the trial judge) denied the motion.

"The decision to allow a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or unless the trial was infected with prejudicial constitutional error" (citation omitted). Commonwealth v. Gorham, 472 Mass. 112, 117 (2015).

---

[21] The defendant also raised the suppression issue as a ground warranting a new trial. The motion judge found that this claim was waived as time barred.

Where an appeal from the denial of the defendant's motion for a new trial has been consolidated with his direct appeal from a conviction of murder in the first degree, we review both under G. L. c. 278, § 33E. See Espada, 450 Mass. at 697. Pursuant to G. L. c. 278, § 33E, we review the denial of the motion for a new trial "to determine whether there has been a significant error of law or other abuse of discretion, . . . and whether any such error creates a substantial likelihood of a miscarriage of justice" (quotations and citations omitted). Commonwealth v. Lally, 473 Mass. 693, 698 (2016).

a. Interpreter. Rodriguez, a native Spanish speaker, testified almost entirely in English.[22,23] At one point during direct examination, defense counsel requested that the court inquire as to whether Rodriguez would like the assistance of an interpreter. The judge determined that Rodriguez was not "showing so much difficulty with the language that she needs an interpreter."[24] Instead, an interpreter was put on stand-by for

_____

[22] Rodriguez also testified in English before the grand jury, and her police statements were in English (although they were made with the assistance of Spanish-speaking police officers). The first of those statements specifically indicated that Rodriguez "read[s], write[s] and understand[s] English."

[23] During their deliberation, the jury requested a transcript of Rodriguez's testimony; the request was denied.

[24] The judge also sustained several objections to leading questions posed by the prosecutor, noting at one point that "the witness hasn't demonstrated any need for prompts." When the

the following day.  When cross-examination began, the interpreter was made available to Rodriguez, the questions were posed to her in English, and she was allowed to use the interpreter's assistance as necessary.[25]  During the course of cross-examination, the interpreter assisted only on two instances.  The defendant argues that the trial judge's refusal to allow Rodriguez to testify on cross-examination through an interpreter restricted his right to present a full defense, in violation of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

By statute, "[a] non-English speaker . . . shall have a right to the assistance of a qualified interpreter who shall be appointed by the judge."  G. L. c. 221C, § 2.  "Non-English speaker" is defined as "a person who cannot speak or understand, or has difficulty in speaking or understanding, the English language, because he uses only or primarily a spoken language other than English."  G. L. c. 221C, § 1.  The party claiming a violation of G. L. c. 221C, § 2, bears the burden of proving

issue was raised the following day at trial, the judge indicated that "[Rodriguez's] direct demeanor, to me, did not demonstrate a lot of difficulty understanding English."

[25] Defense counsel inquired whether Rodriguez wanted the assistance of an interpreter, and Rodriguez indicated that she did.  Rodriguez also indicated that she had some trouble understanding some of the questions on direct examination.

that the witness in question was a "non-English speaker."  See

Crivello v. All-Pak Mach. Sys., Inc., 446 Mass. 729, 735 (2006).

When the issue was raised as part of the defendant's motion for a new trial, the motion judge conducted an evidentiary hearing, at which the defendant called Dr. Michael O'Laughlin, a certified court interpreter and the director of interpreter training at Boston University.  O'Laughlin reviewed Rodriguez's testimony at trial and before the grand jury, her statements to police, and an interview conducted by appellate counsel; he also conducted two independent standardized tests of Rodriguez's language skills in order to assess whether Rodriguez qualified as a non-English speaker.

O'Laughlin concluded that Rodriguez is a limited English proficient speaker, and that her English proficiency, when measured by standardized scores, is "intermediate high." According to the results of that test, Rodriguez "[c]an satisfy survival needs and routine work and social demands [and] handle work that involves following oral and simple written instructions in familiar and some unfamiliar situations. . . . As to listening comprehension, [she] understands conversations on most everyday subjects at normal speed when addressed directly, [but m]ay need repetition, rewording and slower speech. . . .  [A]s to oral communication [she] [f]unctions independently in survival and many social and work situations

but may need help occasionally." O'Laughlin indicated that Rodriguez's English language skills "would be that of a middle school student," and that testifying at trial requires a level of English proficiency at a high school graduate level.

The Commonwealth elicited testimony regarding Rodriguez's language skills from Shannon Driskell, a longtime friend of the victim who was a bridesmaid at Rodriguez's wedding to the victim. Driskell, whose testimony was credited by the motion judge, observed Rodriguez speaking English on a regular basis. On those occasions, Rodriguez spoke only English with her children and the victim. Rodriguez would communicate with Driskell on the Internet social networking site Facebook using English. Driskell testified that she did not have difficulty in communicating with Rodriguez in English.

The motion judge concluded that Rodriguez did not fit the definition of a "non-English speaker" in need of the assistance of an interpreter and that, even if she had been so designated, the qualified interpreter who was made available to her on cross-examination was sufficient to satisfy the assistance necessary under G. L. c. 221C. We agree.[26]

---

[26] At the time of the incident, the witness spoke to her family in English and held a job as a certified nurse's assistant, in which she conducted her responsibilities using English.

b.  Court room closure.  The defendant claims that his Sixth Amendment right to a public trial was violated because his family and friends were excluded from jury selection.  The motion judge declined to hold an evidentiary hearing on this basis, and he denied the defendant's motion outright.

The right to a public trial guaranteed by the Sixth Amendment extends to the jury selection process, and it is a well-settled principle that a properly preserved violation of that right is structural error requiring reversal.  See Penn, 472 Mass. at 622.  However, "even structural error is subject to waiver," Commonwealth v. Celester, 473 Mass. 553, 578 (2016), and "[w]here counsel fails to lodge a timely objection to the closure of the court room -- as happened in this case -- 'the defendant's claim of error is deemed to be procedurally waived.'"  Penn, supra at 622, quoting Commonwealth v. LaChance, 469 Mass. 854, 857 (2014), cert. denied, 136 S. Ct. 317 (2015).  Such waiver need not be consented to by the defendant.  See Commonwealth v. Wall, 469 Mass. 652, 672 (2014).

The uncontroverted evidence tends to show that the court room was closed during jury selection.  It also shows that trial counsel was aware of the court room closure prior to jury selection, and did not object.[27]  The court room closure claim is

---

[27] The defendant's motion for a new trial was accompanied by affidavits from the defendant's mother and sister.  Both

therefore procedurally waived.  Penn, 472 Mass. at 622, quoting LaChance, 469 Mass. at 857.

However, where the defendant's Sixth Amendment right to a public trial has been subject to procedural waiver, the defendant after conviction may still make a collateral attack on the issue based on ineffective assistance of counsel for failure to object to the court room closure.  See Penn, 472 Mass. at 623.  See also LaChance, 462 Mass. at 858.  The defendant must not only make a showing that his attorney was deficient for failing to make a timely objection but also "show that a substantial likelihood of a miscarriage of justice arose from the court room closure."  Penn, supra ("The structural nature of the underlying error does not automatically excuse the defendant from showing prejudice when advancing an unpreserved claim" [citation omitted]).  See LaChance, supra at 857.  The defendant has not proffered any substantive grounds on which the closure of the court room during jury selection would have resulted in any effect on the judgment in the case, and therefore failed to show prejudice arising from counsel's failure to object.[28,29]

---

affidavits aver to the fact that trial counsel was the one who informed them of the court room closure.

[28] The defendant argues that he was prejudiced because trial counsel's failure to object to the closure of the court room has resulted in a less favorable standard of review.  This alone does not create a substantial risk of a miscarriage of justice. See, e.g., Commonwealth v. Penn, 472 Mass. 610, 623 (2015),

c.  Ineffective assistance of counsel.  We review the defendant's ineffective assistance of counsel claims, brought as part of an appeal from a conviction of murder in the first degree, under the substantial likelihood of a miscarriage of justice standard, pursuant to § 33E.  See Commonwealth v. Lessieur, 472 Mass. 317, 326, cert. denied, 136 S. Ct. 418 (2015).  "We consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion" (quotations and citation omitted).  Id. at 327.  The defendant bears the burden of

---

cert. denied, 136 S. Ct. 1656 (2016); Commonwealth v. Jackson, 471 Mass. 262, 269 (2015), cert. denied, 136 S. Ct. 1158 (2016).

[29] The motion judge's decision to deny the defendant's motion for a new trial without first holding an evidentiary hearing on the court room closure issue was not erroneous.  In adjudicating arguments made as part of a motion for a new trial, the motion judge "may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits."  Commonwealth v. Drayton, 473 Mass. 23, 31 (2015), quoting Mass. R. Crim. P. 30 (c), as appearing in 435 Mass. 1501 (2001).  On the other hand, "[w]hen a substantial issue has been raised, and supported by a substantial evidentiary showing . . . the judge should hold an evidentiary hearing" (citation omitted).  Id.  The motion judge effectively assumed the validity of the affidavits attached to the defendant's motion for a new trial, and still (without error) denied the motion.  See Penn, 472 Mass. at 622, where an evidentiary hearing was conducted concerning a court room closure issue and uncovered similar evidence as was assumed by the motion judge in the present case.  The decision to abstain from holding an evidentiary hearing was appropriate.

proving that trial counsel was ineffective.  See <u>Commonwealth</u> v. <u>Alcequiecz</u>, 465 Mass. 557, 563 (2013).[30]

The defendant argues that trial counsel was ineffective for failing to (i) properly prepare defense expert witness, a forensic pathologist, for voir dire examination; (ii) object to the prosecutor's alleged misstatement of the law of self-defense during closing argument; and (iii) elicit testimony from Rodriguez that the victim was using a forearm on the defendant's throat to hold him down.[31,32]  The defendant has not satisfied his burden to prove ineffective assistance of counsel as to any of his claims.  See <u>id</u>.

---

[30] The defendant's claims of ineffective assistance of counsel are not supported by an affidavit from lead counsel at trial, but did include one from co-counsel.  As a result, we must rely only on the record as to whether there was a strategic purpose behind some of counsel's decisions.  We keep in mind that "[r]elief on a claim of ineffective assistance based on the trial record is the weakest form of such a claim because it is 'bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight.'"  <u>Commonwealth</u> v. <u>Gorham</u>, 472 Mass. 112, 116 n.4 (2015), quoting <u>Commonwealth</u> v. <u>Peloquin</u>, 437 Mass. 204, 210 n.5 (2002).

[31] As mentioned above, the motion judge did not err in denying the defendant's ineffective assistance claims regarding the G. L. c. 276, § 33A, telephone rights and the failure to object to the jury instructions on self-defense and excessive force in self-defense issues.

[32] Applying the standard set forth in <u>Commonwealth</u> v. <u>Saferian</u>, 366 Mass. 89, 96 (1974), the motion judge denied the motion as to all the claims of ineffective assistance.

a. <u>Failure to prepare expert witness</u>. Prior to testifying, the expert was subjected to voir dire examination as to his qualifications and bases to testify on certain subjects. The judge concluded, based on the voir dire examination, that the expert would not be allowed to testify as to his opinion that (1) the lack of clustering of the stab wounds indicated defensive action on the part of the defendant; and (2) the blood stains on the floor indicated that the defendant was retreating from the victim or the victim was chasing the defendant. The judge determined that an opinion whether the lack of clustering was indicative of self-defense was inadmissible because "[t]he jury [do] not need to hear it from the expert. They can draw that same conclusion if it's to be drawn." The same was true as to the proposed chasing and retreating testimony, which was "not within the expertise of the proposed witness." The expert was allowed to testify to the positioning, trajectory, and lack of clustering of the stab wounds, and the positioning of the blood stains, but not to the conclusions he drew from those facts. The defendant objected to the expert's testimony being so limited.

Before the jury, the expert testified that it was his opinion that the victim's wounds were likely inflicted when the victim and defendant were "face-to-face." He further opined that there was "no clustering of stab wounds on [the victim],"

and that such a lack of clustering "reflects the nature of the activity used to cause or create those stab wounds that results in the cluster," such that it was inconsistent with "somebody holding a knife and repetitively thrusting it in approximately the same location of the body."  He also testified regarding the fact that the wounds were inflicted in different areas of the apartment, causing blood to pool on various surfaces in the room.  From that testimony, the defense attorney argued as part of his closing that the lack of clustering and the positioning of the blood stains indicated that the parties were moving around during the altercation, and suggested that these were indications that there was not an intent to kill.

"The purpose of expert testimony is to assist the trier of fact in understanding evidence or determining facts in areas where scientific, technical, or other specialized knowledge would be helpful."  See Commonwealth v. Pytou Heang, 458 Mass. 827, 844 (2011).  "Expert testimony is admissible when it will 'help jurors interpret evidence that lies outside of common experience.'"  Commonwealth v. Scott, 464 Mass. 355, 360 n.5 (2013), quoting Commonwealth v. Tanner, 45 Mass. App. Ct. 576, 581 (1998).  See Mass. G. Evid. § 702 (2016).  "A judge has wide discretion in qualifying a witness to offer an expert opinion on a particular question, . . . and [the judge's] determination

will not be upset on appeal if any reasonable basis appears for it" (citations omitted).  Pytou Heang, supra at 845.

There are two distinct reasons that convince us that trial counsel was not ineffective in failing to further prepare the expert.  First, it was not a lack of qualifications that resulted in two of the expert's conclusions being excluded; instead, it was the fact that the evidence he sought to proffer was within the purview of the jury, and would not have "help[ed] jurors interpret [the] evidence."  Scott, 464 Mass. at 360 n.5.  Second, whether trial counsel erred is irrelevant; the areas of testimony to which the expert proposed in his affidavit that he would testify if given another chance would either still be inadmissible or be cumulative of other evidence offered at trial by that expert or by the Commonwealth's expert.  Even assuming that counsel failed to adequately prepare his expert for voir dire examination, the defendant has not met his burden of proving that such a failure would have "influenced the jury's conclusion" (citation omitted).  Lessieur, 472 Mass. at 327.  See Alcequiecz, 465 Mass. at 563.

ii.  Failure to object to Commonwealth's closing argument.  The defendant argues that trial counsel's failure to object to the Commonwealth's closing argument -- which he claims misstated and distorted the law on self-defense and was not fairly supported by the evidence -- constitutes ineffective assistance

of counsel.[33]  Because the defendant did not object to the
closing argument at trial, we review it to determine if any
error in failing to object would have created a substantial
likelihood of a miscarriage of justice.  Commonwealth v.
Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).
Under that standard, we assess the closing argument "in the
context of the entire argument, and in light of the judge's
instructions to the jury and the evidence at trial" (citation
omitted).  Commonwealth v. Carriere, 470 Mass. 1, 19 (2015).

In its closing argument, the Commonwealth argued that the
defendant had "ambush[ed]" the victim, rather than acted in
self-defense.[34]  The prosecutor later stated:

> "The law recognizes there may be circumstances where
> someone can defend themselves with a deadly weapon.
> First, you must avail yourself of all means to avoid
> physical combat.  For example, leave through the front
> door or back door if you can.  . . . Did [the
> defendant] do all he could to avoid physical combat
> when he told [Rodriguez's neighbor] he wasn't leaving
> even though they knew [the victim] was coming home?"
> (emphasis added).

Although the emphasized sentence in the Commonwealth's
closing argument was flawed, neither the argument taken as a

_____

[33] The defendant does not specify in his brief which portion
or portions of the Commonwealth's closing argument misstated the
law, or how such portion or portions had misstated the law.

[34] The prosecutor argued:  "Isn't it far more believable
that . . . [the defendant] was waiting for [the victim] to come
in that door and able to ambush him when he came through the
door with this knife he had on a dresser in that bedroom[?]";
and "[The victim] got ambushed."

whole nor trial counsel's failure to object to that argument created a substantial likelihood of a miscarriage of justice. See id. The single sentence of the Commonwealth's closing argument that indicated that the defendant did not do all he could to avoid physical combat because he had, hours before the altercation, told Rodriguez's neighbor he would not leave the home carried with it an implication that the defendant's actions prior to the time of the purported self-defense should be part of the jury's consideration. However, the rest of the prosecutor's argument concerning self-defense focused on the altercation itself. It is apparent that the jury were not convinced by the prosecutor's premeditation argument, as the charge of murder in the first degree on the theory of deliberate premeditation was rejected. To the extent that the argument may have had any effect on the jury's apparent refusal to recognize that the victim initiated the assault, our reduction of the verdict from murder in the first degree to voluntary manslaughter addresses that concern. See part 6, infra.

iii. Failure to elicit testimony. Finally, the defendant argues that trial counsel was ineffective because he failed to elicit testimony from Rodriguez that the victim was holding the defendant down, using a forearm as a bar across his throat. As mentioned, Rodriguez gave two statements to police. Only the second statement indicated that, after the victim came into the

house and the altercation began between the victim and the defendant, she "could see [the victim] on top of [the defendant] holding [the defendant] down with his left forearm, by his neck."

The defendant has not met his burden of showing that better representation would have influenced the jury's conclusion.  See Alcequiecz, 465 Mass. at 563.  At trial, Rodriguez testified that the victim, who was much larger than the defendant, picked up the defendant, threw him against the air conditioner, and was on top of him.  She also specified that the victim had his hand on top of the defendant, and that the defendant could not have gotten away from the victim.  Although eliciting a more specific placement of the victim's hand on the defendant's throat may have bolstered his claim that he was in fear of his life, it would have been cumulative of the evidence already offered by Rodriguez.  Further, based on the record, it was not manifestly unreasonable for trial counsel to avoid references to Rodriguez's second police statement, given that it included several potentially inculpatory statements purportedly made by the defendant.[35]  See Commonwealth v. Riley, 467 Mass. 799, 808 (2014).

---

[35] For example, Rodriguez told police that the defendant had told her that if the victim ever came to the apartment, he, the defendant, would stab the victim.

d.  Newly discovered evidence.  The defendant moved for a new trial on the basis of newly discovered evidence in the form of an opinion from a psychologist who, according to his affidavit, specializes in combat-related treatment.  The defendant sought testimony from the psychologist concerning the effects that a forearm across someone's throat might cause.  Specifically, he would have testified that such forearm pressure to the throat can cause an adversary to lose consciousness and would put an adversary in reasonable fear that he was in immediate danger of being killed or seriously injured.

The motion judge was entitled to make a ruling on the defendant's motion on this ground without an evidentiary hearing.  See Commonwealth v. Drayton, 473 Mass. 23, 32 (2015), quoting Mass. R. Crim. P. 30 (c), as appearing in 435 Mass. 1501 (2001) (only "substantial" issue warrants evidentiary hearing).  To prevail on a motion for a new trial on this ground, "[f]irst, the defendant must establish that the evidence is 'newly available,' [and,] [s]econd, the defendant must show that the evidence 'casts real doubt on the justice of the conviction'" (citations omitted).  Commonwealth v. Cameron, 473 Mass. 100, 104 (2014).  See Commonwealth v. Grace, 397 Mass. 303, 305 (1986).

The defendant has not met his burden of establishing that the proposed testimony is newly available.  Commonwealth v.

Sullivan, 469 Mass. 340, 350 n.6 (2014) ("Newly available evidence is evidence that was unavailable at the time of trial for a reason such as . . . a particular forensic testing methodology had not yet been developed or gained acceptance by the courts").  The defendant offers no argument that the testimony that would have been offered by the psychologist at an evidentiary hearing could not have been uncovered by the defense at the time of trial.  There was therefore no "substantial" issue that required the motion judge to hold an evidentiary hearing.  The motion for a new trial was properly denied.[36]

6.  Review under G. L. c. 278, § 33E.  The defendant requests that we exercise our extraordinary authority under G. L. c. 278, § 33E, to order a new trial or reduce the verdict of murder in the first degree to voluntary manslaughter.  "Our duty under G. L. c. 278, § 33E, is to consider broadly the whole

---

[36] We are also not convinced (though we need not decide) that the psychologist's testimony would have been admitted even if offered at trial.  The jury heard testimony that the defendant reasonably feared that the victim would kill him, as adduced from their differences in size and physical strengths. A fellow member of the National Guard testified that the victim was trained in unarmed combat and that he could incapacitate or kill another person.  Rodriguez testified that the defendant was pinned down by the larger victim.  And the defendant himself told the police that he "had no choice" but to attack the victim, and that he did so in self-defense.  The psychologist's testimony, if offered at the time of trial, may have been cumulative of other testimony, and does not "cast real doubt on the justice of the conviction."  Commonwealth v. Cameron, 473 Mass. 100, 104 (2015), quoting Commonwealth v. Grace, 397 Mass. 303, 305 (1986).

case on the law and the facts to determine whether the verdict is consonant with justice" (quotations and citation omitted). Commonwealth v. Howard, 469 Mass. 721, 747 (2014). On such consideration, we "may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt." G. L. c. 278, § 33E. See Commonwealth v. Baker, 346 Mass. 107, 109 (1963) ("If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty to so declare"). "Each case depends on its peculiar facts. No one fact is conclusive. A most important consideration is whether the jury verdict is markedly inconsistent with verdicts returned in similar cases" (citation omitted). Commonwealth v. Colleran, 452 Mass. 417, 432 (2008).

There are a number of factors we have considered in similar cases in mitigating a verdict of murder in the first degree under § 33E:

"Those factors include: whether the intent to kill was formed 'in the heat of sudden affray or combat,' [Baker, 346 Mass. at 119]; whether the homicide occurred in

the course of a 'senseless brawl,' Commonwealth v. Ransom, 358 Mass. 580, 583 (1971); whether 'a minor controversy . . . explode[d] into the killing of a human being,' [Baker], supra at 110; whether '[t]he entire sequence reflects spontaneity rather than premeditation,' Commonwealth v. Williams, [364 Mass. 145, 152 (1973)]; whether the defendant carried a weapon to the scene, id., or left the scene after an initial confrontation and returned with a weapon to kill the victim, Commonwealth v. Jones, 366 Mass. 805, 809 (1975); whether the victim was the first aggressor, [Baker], supra at 118; whether the defendant and the victim were strangers, [Ransom], supra at 583, or, if only acquaintances, whether there had been prior trouble between them, [Jones], supra at 808; whether the defendant and the victim had enjoyed a good relationship prior to the killing, Commonwealth v. Seit, 373 Mass. 83, 94 (1977); whether alcohol or drugs were involved, [Ransom], supra at 583; the personal characteristics of the defendant, such as age, Commonwealth v. McDermott, 393 Mass. 451, 460–461 (1984) (seventeen years old), [Jones], supra at 808 (twenty-eight years old); family, id. (married with six small children); hard working, [Seit], supra at 95; disability, Commonwealth v. Vanderpool, 367 Mass. 743, 750 (1975); and lack of prior criminal record, [Jones], supra."

Colleran, supra at 431-432.  Most recently, in reducing a verdict from murder in the first degree to voluntary manslaughter, we principally considered the particulars of the fight that led to the victim's death.  See Commonwealth v. Niemic, 472 Mass. 665, 679 (2015).

In Jones, 366 Mass. at 805, the defendant was convicted of murder in the second degree on an indictment charging murder in the first degree.  The defendant had fatally stabbed the victim after an altercation.  Id. at 807.  That day, the defendant and the victim had done a considerable amount of drinking.  Id.  The two had gotten into an argument earlier in the day, and their

paths crossed again hours later. Id. The argument resumed, the victim "struck the defendant with a heavy blow on the jaw," and the defendant retaliated with his knife. Id. At trial, the defendant testified that he used his knife in self-defense because the victim had come at him with a straight edge razor. Id. We were not convinced that the fatal wound was inflicted in the appropriate exercise of self-defense, but still acknowledged that the defendant "was reasonably apprehensive that the victim might use the razor which the defendant knew the victim possessed," due to the victim's reputation. Id. at 808-809. We reduced the verdict from murder in the second degree to manslaughter because of the absence of malice. Id. at 808. We concluded that the fatal attack was "senseless, undoubtedly the result of too much drinking," and that the intention to attack was "formed in the heat of sudden affray or combat, . . . thus negating the necessary element of malice" (citations omitted). Id. at 808-809.

There are many factors in the present case that convince us that a reduction is warranted. The jury rejected the theory of deliberate premeditation, meaning that it focused its inquiry exclusively on the altercation itself. There was evidence that the victim was the initial aggressor;, that the defendant reasonably could have been and was fearful of the victim, who was much larger, trained in unarmed combat, and enraged; and

that the defendant swung the knife in a wild manner.  Moreover,
prior to using the knife in self-defense, the defendant told
Rodriguez to telephone 911.  After the altercation, he gave a
full statement to police and never contested his involvement in
the victim's death.  The sequence that led to the killing
indicates spontaneity, and reflects that the killing was more
the product of sudden combat and the heat of passion than of
malice.  See Jones, 366 Mass. at 809.

It is our conclusion that the jury relied on a confluence
of factors, including a complicated set of instructions, in
reaching their verdict, which, taken together, may have produced
a result not consonant with justice.  Voluntary manslaughter due
to mitigating circumstances shares several of the factors
delineated by the judge as to a finding of murder in the first
degree on the theory of extreme atrocity or cruelty.[37]  See
Commonwealth v. Berry, 466 Mass. 763, 776 (2014) (Gants, J.,
concurring) ("If the jury were to rest their finding of extreme

---

[37] The judge instructed on the following factors to be
considered by the jury in determining whether the defendant was
guilty of murder in the first degree:  "One, whether the
defendant was indifferent to or took pleasure in the suffering
of the deceased; two, the consciousness and degree of suffering
of the deceased; three, the extent of the injuries to the
deceased; four, the number of blows delivered; five, the manner,
degree and severity of the force used; six, the nature of the
weapon, instrument or method used; and seven, the disproportion
between the means needed to cause death and those employed").
The third, fourth, fifth, sixth, and seventh factors could also
be indicative of voluntary manslaughter if the jury did not find
malice.

atrocity or cruelty on any but the first <u>Cunneen</u> factor, [see <u>Commonwealth</u> v. <u>Cunneen</u>, 389 Mass. 216, 227 (1983),] the jury need not focus on the defendant's state of mind. Consequently, a defendant may be found guilty of murder in the first degree with extreme atrocity or cruelty where the defendant did not intend that victim suffer before he died but nonetheless did suffer an agonizing death"). The evidence appears overwhelming that the Commonwealth failed to meet its burden in proving the absence of mitigating circumstances beyond a reasonable doubt and, for this reason, we are concerned that the prosecutor's closing argument regarding lying in wait and the judge's failure to address this possibility in the jury instructions may have led the jury astray.

Like the fight in <u>Jones</u>, 366 Mass. at 807, the altercation in the present case was a senseless brawl. The defendant, through no malicious actions of his own, found himself in a relationship with a woman whose estranged husband had violent tendencies and was trained to kill. The weight of the evidence supports the conclusion that the defendant killed the victim either as the result of reasonable provocation or through the use of excessive force in self-defense. Under either circumstance, the killing was the result of uncontrolled violent action on the part of the defendant and the victim. Because of the unusual circumstances of this case, and the fact that it

presents multiple factors we have considered in the past when exercising our power under § 33E, a conviction of voluntary manslaughter is more consonant with justice, and we exercise our extraordinary authority under § 33E to reduce the verdict.  See Niemic, 472 Mass. at 679; Jones, 366 Mass. at 809-810.[38]

The case is remanded to the Superior Court, where the verdict of murder in the first degree and sentence imposed shall be vacated.  A verdict of guilty of voluntary manslaughter shall be entered and a sentence imposed.

So ordered.

---

[38] In his closing argument, the prosecutor acknowledged that the evidence at trial, at a minimum, proved that the defendant used excessive force in self-defense, and that the jury would be warranted in returning a guilty verdict as to voluntary manslaughter.